**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

UNITED STATES,

        **Plaintiff,**

                                    **Case No. 1:24-cr-114-1**

    v.

                                    **JUDGE DOUGLAS R. COLE**

MARICO KEELING,

        **Defendant.**

## OPINION AND ORDER

This long-pending criminal matter is set for retrial on July 20, 2026. That will mark the third time that a jury will be sworn in the case. The first effort ended with a hung jury. And the second go around (about a month-and-a-half ago) ended in a mistrial as a result of an error during jury selection. Now, in the run-up to the third trial, Keeling has moved to dismiss the indictment, citing both Fifth Amendment double-jeopardy concerns and his Sixth Amendment speedy-trial rights. (Doc. 158). For the reasons explained below, the Court rejects his arguments on both fronts and thus **DENIES** the motion.

## BACKGROUND

On October 10, 2024, Marico Keeling was charged via criminal complaint with possessing controlled substances with the intent to distribute them. (Doc. 1, #27). Two weeks later, a grand jury indicted him on one count of conspiring to traffic drugs and two counts of possessing methamphetamine with the intent to distribute it. (Doc. 11,

#49–50). Shortly thereafter, the Court set trial in the matter for January 6, 2025. (Doc. 15, #59). But since then, delay after delay has plagued this case.

Keeling delayed his first trial in a few different ways. First, he moved for a continuance on December 12, 2024, to review discovery materials, which pushed the trial date until February 24, 2025. (Doc. 16, #61; Doc. 18, #67). Then, Keeling's counsel moved to withdraw due to "irreconcilable differences," which the then-assigned Judge granted. (Doc. 19, #68; Doc. 21, #73). Because of that change of counsel, Keeling requested another two continuances, which postponed the trial until late April 2025. (Doc. 24, #76; Doc. 26, #85–86).

As that new trial date approached, Keeling again moved to change counsel. (4/2/2025 Min. Entry). When the Court denied that motion, Keeling decided to proceed pro se. (*Id.*). Less than two weeks later, Keeling had a change of heart and moved for his previous counsel to be reappointed, (Doc. 29), and for an extension of time, (Doc. 30), though he later withdrew the latter motion, (*see* 4/22/25 Min. Entry). The Court reinstated his attorneys. (*Id.*). Then, Keeling's reappointed counsel requested a further continuance "to address … Keeling's remaining concerns about his initial detention, his arrest, and purported outstanding discovery." (Doc. 31, #99). The Court agreed to that request and scheduled a status conference for May 21, 2025. (*Id.*). At that status conference, Keeling requested the Court set a trial date, and it did so—July 7, 2025. (Doc. 34, #103).

The trial went forward on that date as scheduled. (7/7/25 Min. Entry). But that did not end this saga. The jury was unable to reach a unanimous verdict, so the Court declared a mistrial. (Doc. 60, #256).

Three weeks later, the government filed a second superseding indictment. (Doc. 65). There, it charged Keeling with one count of conspiring to distribute and possess with intent to distribute fentanyl, cocaine, and methamphetamine; two counts of distributing methamphetamine; and one count of distributing fentanyl. (*Id.* at #315–17). The Court set a trial date of September 8, 2025, which was a little more than a month after Keeling's first appearance on that new indictment. (8/19/2025 Min. Entry).

But that trial date did not last for long. On August 29, 2025, Keeling moved for a continuance "to explore potential plea options." (Doc. 88, #830). And he was "willing to waive any and all speedy trial rights to accommodate this request." (*Id.*). The Court granted his motion and delayed the trial until November 2025. (8/29/2025 Min. Entry). Less than a week later, though, Keeling moved to appoint new counsel, and his attorney filed his own motion to withdraw. (Doc. 90; Doc. 92). The Court granted the withdrawal motion and appointed a third new attorney for Keeling. (10/1/2025 Min. Entry). That new attorney needed time to get up to speed on the case, so Keeling requested a continuance, which the Court granted. (Doc. 94, #884–86). Keeling then requested yet another continuance to review a video interview of the government's cooperating witness. (Doc. 123). The Court agreed to that request, as well, which postponed the retrial date until May 11, 2026. (Doc. 124, #1756).

At the final pretrial conference for that second trial, the Court ordered that the parties follow a blind-strike procedure for jury selection. (Doc. 137, #1884; Doc. 141, #1992). Under that method, both sides would separately list their peremptory strikes without knowing which prospective jurors the other side had included on its list. (Doc. 141, #1992). But that procedure differed from how courts in this district typically select juries. As a result, the attorneys were not familiar with how to conduct the blind-strike method. (*See* Doc. 155, #2116).

Because the way in which jury selection played out figures prominently in Keeling's present double-jeopardy argument, the Court describes the events in some detail. To start, while the then-presiding Judge had announced at the final pretrial conference the method that the parties were to use (the blind-strike method), he referred the actual jury-selection process itself (with Keeling's consent) to a Magistrate Judge to conduct. (Doc. 137, #1884). The Magistrate Judge then altered the process from what the presiding Judge had described at the final pretrial conference.

To explain that a bit more fully, the presiding Judge had dictated that, after removing any jurors from the venire who were struck for cause, the Court would keep the 32 potential jurors with the lowest juror numbers and release the rest.[1] (Doc. 141, #1991–92). Next, the Court would divide those remaining 32 potential jurors into two pools: the 28 individuals with the lowest juror numbers would form the main jury

---

[1] This was the maximum number of jurors needed to impanel a jury of 12 plus two alternates if both parties were to exercise all their peremptory strikes with no overlapping strikes. (Doc. 141, #1991).

4

pool, and the last four would be the prospective alternates. (*Id.*). Both parties would then provide their competing lists of peremptory strikes for main jurors (six for the government and ten for the defendant) and include one more strike (an alternate strike), which could be used only against the last four jurors (the alternate pool). (*Id.*). Implemented that way, the blind-strike process would ensure that the alternate strikes could not be directed against members of the main jury.

But the Magistrate Judge did not exactly follow that process. To start, instead of releasing all but 32 jurors, she kept the entire jury pool that remained after removing jurors who had been struck for cause. (*See* Doc. 153, #2087). While that, in and of itself, would not have caused a problem, she also did not divide the prospective main jurors and prospective alternates into separate pools. (*See* Doc. 155, #2117). So what had been a partitioned method—one set of blind strikes to the main jury pool and a different set of blind strikes to a separate alternate pool—became instead a consolidated process of main and alternate juror strikes simultaneously directed at the entire pool of potential jurors. The upshot of this change? The parties did not know when listing their strikes who was a prospective juror and who was a prospective alternate. (*See* Doc. 153, #2087–89).

Compounding that problem, the Magistrate Judge granted the parties up to two extra strikes in case any of their blind strikes overlapped. (Doc. 155, #2117–18). To that end, the Magistrate Judge directed the parties to "list your main preemptory challenges, and then you'll draw a line, and underneath that, you'll list three more. If there's overlap, I take from that first list of three. If there's no overlap, then, the

5

first person on that … list of three becomes your challenge to the alternate." (*Id.* at #2129–30). In other words, the Magistrate Judge's method had three "hybrid" strikes. These strikes might end up applying either to a main juror or to an alternate, depending on whether there had been an overlap in the parties' blind strikes on main jurors. Both parties agreed to that procedure. (*Id.* at #2130).

But the hybrid nature of the strikes caused additional confusion. As a general matter, a party can use a main juror peremptory against anyone in the jury pool, whether that person is likely to be selected or not. So if the jury pool consists of jurors numbered 1 through 40, a main juror peremptory can be used against any of those jurors. In contrast, a party can use an alternate strike only against potential alternate jurors and cannot use such a strike to remove someone from the main jury. Fed. R. Crim. P. 24(c)(4). Against that backdrop, hybrid strikes like those the Magistrate Judge allowed here can easily run afoul of these rules. If the Court ends up using them as main strikes (because of overlap), a party can direct them at any juror. Yet, as alternate strikes, that is not allowed—the party can only direct them against jurors who are *not* on the main jury. But when the parties list their hybrid strikes, they do not know whether the Court ultimately will use them as main juror strikes (due to overlap) or alternate juror strikes.

How did it all play out here? After the Magistrate Judge conducted voir dire, each side submitted its list of peremptory strikes, both main and alternate, prepared as set forth above. (Doc. 156, #2240; Doc. 148 (lists)). The Magistrate Judge then reconciled the parties' lists and identified the jurors that she planned to impanel.

6

(Doc. 156, #2240–41; Doc. 148, #2072 (court's notes)). Because the Magistrate Judge did not need to use the government's extra strikes to cover any overlap, she counted the government's first strike below the line as its challenge to the alternate. (*See* Doc. 148, #2072). Unfortunately, the strike was directed at a juror whose number was low enough that, absent the strike, she would have been a member of the *main* jury. That is, the way the procedure was implemented, and given the lack of overlap in the main jury strikes, the government ended up using its "alternate strike" to remove a member of the main jury.

Keeling's counsel seemingly recognized what had happened. When the jurors returned to the courtroom, and before the Court seated the jury, Keeling objected. He argued that when the government "listed their strike of an alternate," they "somehow went back into the body of the venire" and effectively "granted themselves a seventh" peremptory strike. (Doc. 156, #2247, 2249–50). But Keeling could not identify any legal authority supporting his objection. (*Id.* at #2250). So the Magistrate Judge overruled it and impaneled the jury. (*Id.* at #2250–51, 2256).

The next morning, though, the Court revisited Keeling's objection to the government's use of its alternate strike. (Doc. 153, #2085). The Court determined that the government violated Federal Rule of Criminal Procedure 24(c)(4), (*id.* at #2091), which provides that "additional [peremptory] challenges may be used only to remove alternate jurors." In response, Keeling requested that the Court either bring back the erroneously struck juror, which he recognized was an "impossible" remedy, or declare a mistrial and pick a new jury. (*Id.* at #2091, 2093). Because the erroneously struck

juror had already been dismissed, the Court granted Keeling's request for a mistrial. (*Id.* at #2094; Doc. 150, #2080). The matter was then reassigned to the undersigned, and the Court promptly set a new retrial date of July 20, 2026, the earliest date that would work for the parties' and the Court's calendar. (Doc. 152, #2083).

Keeling has now moved to dismiss. (Doc. 158). The government has responded. (Doc. 161).[2] And Keeling has filed a reply. (Doc. 162). So the matter is ripe for the Court's review.

### LAW AND ANALYSIS

In attempting to dismiss the second superseding indictment, Keeling raises two challenges. (Doc. 158). First, he argues that a retrial would violate his rights under the Fifth Amendment's Double Jeopardy Clause because the government intentionally engaged in misconduct to provoke his request for a mistrial. (*Id.* at #2264–67). Second, Keeling contends that the retrial would violate his speedy-trial rights under the Sixth Amendment.[3] (*Id.* at #2268–70). Both challenges fail.

**A.    The Fifth Amendment Double-Jeopardy Challenge Fails, as Keeling Sought the Mistrial, and the Government Did Not Engage in Misconduct that Caused It.**

Start with Keeling's double-jeopardy claim. The Fifth Amendment's Double Jeopardy Clause "protects a criminal defendant from repeated prosecutions for the

---

[2] The government filed a response on June 29, 2026, (Doc. 160), and then filed an amended response about a week later, (Doc. 161). The amended response simply adds some citations to the record that the government neglected to include in its original filing. The Court treats the latter as the operative filing.

[3] He does not press a Speedy Trial Act claim, but rather solely a constitutional speedy-trial claim.

same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). But that clause does not bar a retrial when "a trial is terminated at the defendant's urging." *Phillips v. Ct. of Common Pleas*, 668 F.3d 804, 811 (6th Cir. 2012). In other words, a defendant's "decision to move for a mistrial is generally deemed a waiver of [his] double jeopardy rights." *United States v. Foster*, 945 F.3d 470, 474 (6th Cir. 2019). Here, Keeling moved for a mistrial, which would ordinarily waive his double-jeopardy claim.

Nevertheless, the Supreme Court has recognized "a narrow exception" to this rule: when the government engaged in misconduct that was "intended to 'goad' the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 673, 676. To determine whether that exception applies, courts look to "objective facts and circumstances" as evidence of the government's intent. *Id.* at 675. But this standard is "exacting." *Phillips*, 668 F.3d at 811 (quotation omitted). The defendant "has the difficult task of showing the prosecutor intended to cause a mistrial by his improper actions, and was not simply trying to obtain a conviction by any means necessary." *United States v. Koubriti*, 509 F.3d 746, 749 (6th Cir. 2007). In an effort to make that showing, Keeling asserts that the government intentionally violated the rules governing jury selection to provoke a mistrial, but his claim falls short.

For starters, Keeling has not identified any objective facts or circumstances showing that the government intentionally engaged in misconduct. Rather, the government's error in the use of its juror strikes likely stemmed from misunderstanding the blind-strike method of jury selection. Indeed, neither party

9

(nor for that matter the Court) had ever used this process to select a jury before. (*See* Doc. 155, #2116).[4]

The parties' lack of familiarity was compounded by the Court's evolving instructions for jury selection. The then-presiding Judge explained the blind-strike method one way at the final pretrial conference, but later issued a minute-entry order citing Sixth Circuit cases that described the process somewhat differently. (*Compare* Doc. 141, #1990–92, *with* Doc. 137, #1884 (first citing *United States v. Mosely*, 810 F.2d 93, 95–97 (6th Cir. 1987); and then citing *United States v. Delgado*, 350 F.3d 520, 523–26 (6th Cir. 2003))). Then, as noted above, the Magistrate Judge also made multiple changes to the blind-strike procedures from both what the presiding Judge had instructed and what the cited cases said.

So, perhaps unsurprisingly, when Keeling objected to the government's use of its alternate strike, the prosecutor remarked that the "system is very confusing" and emphasized that the government thought it had complied with the Court's instructions. (Doc. 156, #2249). And when Keeling renewed his objection the next day, both parties appeared confused about how the jury selection played out. (*See* Doc. 153, #2089–90).

In short, the objective facts and circumstances in the record indicate that the government's Rule 24 violation was not intentional, but rather resulted from its

---

[4] While only defense counsel expressly acknowledged his lack of experience, as further described below, the transcript suggests the government's unfamiliarity with the method, as well.

confusion over the blind-strike procedure and the multiple changes to that jury-selection method.

Moreover, even if the government intentionally violated Rule 24, Keeling still has not established that it did so intending to provoke a mistrial, rather than merely to increase its chances of a guilty verdict. *See Koubriti*, 509 F.3d at 749. As the government explained, it sought to strike the juror at issue because "she answered questions indicating she would be more suspicious as it relates to the dealings with … a confidential informant." (Doc. 156, #2248). The government's case relied on confidential informants and cooperating witnesses, so it used its peremptory challenges to strike all likely jurors who "similarly express[ed] skepticism." (*Id.* at #2203, 2248–51). This suggests that even if the government had some inkling it may be gaming the jury-selection system (which, as described above, the Court finds unlikely), it was doing so to maximize its chances of conviction by removing a juror who would have been skeptical of its key witnesses. Even if that is what happened, that motive is simply not enough to bar Keeling's retrial under the Double Jeopardy Clause. *See Koubriti*, 509 F.3d at 749.

Nevertheless, Keeling suggests that the government's response to his objections indicates it wanted to "goad the mistrial." (Doc. 158, #2266). Not so. First, Keeling faults the government for opposing his objection to the jury-selection procedure. (*Id.*). Had the government not done so, he says, the error would not have occurred. But at the time Keeling raised this concern to the Magistrate Judge, his objection was anything but "clear." (*Id.*). After all, he never mentioned Rule 24, nor

11

could he cite any legal authority supporting his objection. (Doc. 156, #2250). So it is not surprising the government opposed that unsupported objection. Then, when Keeling crystallized his objection the next morning, and the Court alerted the parties to Rule 24(c)(4)'s text, the government confessed error. (Doc. 153, #2090–91).

Second, and somewhat counter-intuitively, Keeling claims that the government failed to adequately resist his request for a mistrial. (Doc. 158, #2266–67). But even if failing to resist is enough (an issue the Court does not reach), Keeling is wrong to suggest such a failure occurred here. The government proposed an alternate remedy of giving Keeling another peremptory strike to use on the main jury to counterbalance the extra strike the government had received. (Doc. 153, #2091). It also argued that Keeling had not demonstrated prejudice from the error, so a mistrial was not warranted. (*Id.* at #2093–94). Plus, the government later noted that, as a practical matter, it had several out-of-town witnesses, which would make scheduling a retrial difficult and entail significant expense. (*Id.* at #2094; *see* Doc. 161, #2303). The government's attempt to identify alternatives, its opposition to declaring a mistrial, and the difficulties it identified in moving forward with a retrial all indicate that it was not (even indirectly) seeking a mistrial, but instead hoped to proceed to trial as planned.

Because Keeling has not identified anything in the record to suggest that the government intended to goad a mistrial, the Double Jeopardy Clause does not bar his retrial. So the Court denies Keeling's motion to dismiss on double-jeopardy grounds.

**B.    The Sixth Amendment Speedy-Trial Challenge Fails Because Most of the Delay in Bringing This Matter to Trial is Attributable to Keeling.**

Next, turn to Keeling's speedy-trial claim. The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial." U.S. Const. amend. VI. That right attaches when a defendant is arrested or indicted, whichever occurs first. *United States v. Marion*, 404 U.S. 307, 320 (1971). To determine whether a pretrial delay violates a defendant's Sixth Amendment rights, courts balance four factors: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). However, the length of the delay is "a triggering mechanism." *Id.* In other words, if the delay is not "presumptively prejudicial," there is no need to balance the remaining factors. *Id.* "A delay of close to one year is presumptively prejudicial." *United States v. Richards*, 164 F.4th 508, 518 (6th Cir. 2026) (quotation omitted). The Sixth Circuit has also suggested that presumption might kick in as early as "around eight to ten months." *Id.* But importantly, in toting up the months, "any delay that the defendant caused doesn't count for purposes of calculating overall delay." *Id.*

The delay between Keeling's arrest on October 10, 2024, and retrial date of July 20, 2026, is admittedly about 21.5 months. (*Compare* Doc. 4, #37, *with* Doc. 152, #2083). But most of that delay does not count toward the presumptively prejudicial limit because it is attributable to Keeling's own repeated motions for continuances. *Richards*, 164 F.4th at 518. As detailed above, Keeling moved for multiple continuances and changes of counsel leading up to his first trial. At a minimum, Keeling is responsible for the delay between December 12, 2024, and May 21, 2025,

13

which is when he finally requested that the Court set a trial date. That delay amounts to approximately 5.5 months. Then, after his first trial resulted in a hung jury, the same pattern repeated where Keeling moved several times for continuances and to change counsel. Those motions delayed his retrial from August 29, 2025, until May 11, 2026, which is another 8.5 months.

In sum, Keeling's own litigation decisions account for at least 14 months of the 21.5 months in delay leading up to his third trial date. And the remaining delay of 7.5 months is not "uncommonly long." *Id.* So his Sixth Amendment claim fails at the "threshold," and the Court need not consider the remaining *Barker* factors. *Id.*

But even if the Court were to evaluate those other factors, Keeling's Sixth Amendment claim would still fail. The second *Barker* factor looks to the reason for the delay. 407 U.S. at 530. The Sixth Circuit has explained that this factor "weigh[s] against the defendant if he is responsible for a significant period of the overall delay." *United States v. Schuster*, 135 F.4th 1037, 1052 (6th Cir. 2025). As noted above, Keeling was responsible for approximately two thirds of the delay in this case. And there is no indication that the government "deliberate[ly] attempt[ed] to delay the trial in order to hamper the defense." *Barker*, 407 U.S. at 531. So Keeling's greater contributions to the delays here mean that the second *Barker* factor favors the government. *Schuster*, 135 F.4th at 1052; *see also United States v. Robinson*, 455 F.3d 602, 608 (6th Cir. 2006) (finding that the better part of a seventeen-month delay "was attributable to the defendant because of various continuances," a change in counsel,

14

and "requests for additional time to file a supplemental memorandum in support of his motion to dismiss").

The third *Barker* factor considers the defendant's assertion of his speedy-trial rights. 407 U.S. at 530. Keeling did not assert those rights until June 2026, approximately 20 months after his arrest. (Doc. 158, #2268–70). Keeling's "failure to assert his rights in a timely fashion weighs heavily against his Sixth Amendment claim." *Schuster*, 135 F.4th at 1052 (quotation omitted); *see also United States v. Sutton*, 862 F.3d 547, 561 (6th Cir. 2017) (collecting cases). Plus, in one of his motions for a continuance, Keeling indicated that he was "willing to waive any and all speedy trial rights." (Doc. 88, #830). That concession "casts doubt on the sincerity of his belated demand for a speedy trial." *Schuster*, 135 F.4th at 1053 (cleaned up). Furthermore, his "substantial contributions" to the delay by repeatedly moving for continuances or to change counsel "belie his later attempt[] to assert his speedy trial rights." *Id.* at 1053 (quotation omitted). When the "record … strongly indicates, as does this one, that the defendant did not want a speedy trial," a court should be "reluctant" to find a constitutional violation absent some "extraordinary circumstances." *Barker*, 407 U.S. at 536. Keeling identifies no such extraordinary circumstances here. Thus, his failure to assert his Sixth Amendment rights in a timely manner combined with his dilatory litigation conduct undermines his speedy-trial claim.

The final *Barker* factor examines the prejudice to the defendant. 407 U.S. at 530. "When the government prosecutes a case with reasonable diligence," as it has

done here, "a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay." *United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000). Keeling has not demonstrated with specificity how the delays prejudiced him. *See Sutton*, 862 F.3d at 562. For example, he has not identified any witnesses who are no longer available to testify.[5] *See United States v. White*, 985 F.2d 271, 276 (6th Cir. 1993). Instead, Keeling emphasizes the disruption to his family because of his pretrial incarceration. (Doc. 158, #2269–70). But a "general reliance" on the length of pretrial incarceration does not suffice. *Schuster*, 135 F.4th at 1055; *see also United States v. Allen*, 86 F.4th 295, 306–07 (6th Cir. 2023) (per curiam) (rejecting the defendants' prejudice argument even though they had been in pretrial detention for years because they could "identify no 'specific' harm to their defense that the delay caused"). That is especially true when a defendant's "substantial contributions to the delay … precipitated much of the general harm coming from his pretrial detention." *Schuster*, 135 F.4th at 1055. In other words, "when a defendant is responsible for

---

[5] In his reply brief, Keeling argues for the first time that he has been prejudiced because certain drug evidence was destroyed. (Doc. 162, #2316–17). But this late-breaking argument does not salvage his speedy-trial claim. For starters, arguments raised for the first time in a reply brief are forfeited. *See, e.g., United States v. Carson*, 560 F.3d 566, 587 (6th Cir. 2009); *United States v. Abdulkadir*, No. 1:21-cr-377, 2025 WL 3134609, at *7 (N.D. Ohio Nov. 10, 2025). What's more, Keeling does not explain why he was unable to test or analyze the drugs in the time leading up to either of his first two trials. *See United States v. Young*, 657 F.3d 408, 420 (6th Cir. 2011) (finding no prejudice from the destruction of records when "nothing precluded [defense] counsel from obtaining these records early in the case"); *see also United States v. Richardson*, 793 F.3d 612, 626 (6th Cir. 2015) (finding no prejudice when defense counsel failed to investigate potential witnesses before they died), *vacated on other grounds*, 577 U.S. 1129 (2016). Plus, as noted above, Keeling is responsible for most of the delays in this case, so he cannot now complain that the delays he caused resulted in the loss of evidence (especially as he never expressed any interest in testing that evidence). *See Schuster*, 135 F.4th at 1055.

16

much of the prejudice he complains of, he cannot leverage that prejudice in his favor." *Id.* That is precisely the case here.

In short, Keeling has not established that the government violated his speedy-trial rights, so the Court denies his motion to dismiss on that basis.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Keeling's Motion to Dismiss (Doc. 158).

**SO ORDERED.**

July 10, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

17